[Cite as *In re S.J.*, 2013-Ohio-3653.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

IN RE: S.J., Jr.                                    :

                                                    :        C.A. CASE NO.    25551

                                                    :        T.C. NO.    2009-9919

                                                    :        (Civil appeal from Common
                                                             Pleas Court, Juvenile Division)
                                                    :

                                                    :

                                      . . . . . . . . . .

                                **O P I N I O N**

                    Rendered on the ___23rd___ day of _____August_____, 2013.

                                      . . . . . . . . . .

MATTHEW T. CRAWFORD, Atty. Reg. No. 0089205, Assistant Prosecuting Attorney, 301
W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

SARAH MICHEL, Atty. Reg. No. 0087773, 15 W. Fourth Street, Suite 100, Dayton, Ohio
45402
        Attorney for Defendant-Appellant

                                      . . . . . . . . . .

FROELICH, J.

        {¶ 1}   Father appeals from a judgment of the Montgomery County Court of

Common Pleas, Juvenile Division, which overruled his objections to a magistrate's decision and awarded permanent custody of his son, S.J., Jr., to Montgomery County Children Services (MCCS).

{¶ 2} Father contends that the juvenile court abused its discretion in awarding permanent custody of his son to MCCS, because the record does not support a finding that permanent custody is in the best interest of the child. Father emphasizes that he made substantial efforts toward completing his case plan. Father further contends that MCCS failed to make reasonable efforts at reunification. Finally, he asserts that the trial court erred in relying on outdated medical expert testimony in reaching its decision. For the following reasons, we will affirm the trial court's judgment.

## I. Factual and Procedural History

{¶ 3} S.J. was born on October 31, 2009. Four days later, prior to his release from the hospital, S.J. was taken into the temporary custody of MCCS due to concerns regarding the parents' hygiene, their care of S.J. while at the hospital, the mother's mental health issues, the parents' lack of income, MCCS's inability to assess the home environment, and MCCS's prior involvement with a half-sibling. The child was adjudicated dependent in January 2010. In September 2010, MCCS requested permanent custody of S.J. However, the parties reached an agreement to extend temporary custody to MCCS, and the trial court ordered temporary custody to be extended in November 2010 and July 2011. Temporary custody was scheduled to end on November 2, 2011.

{¶ 4} On November 2, 2011, MCCS moved for permanent custody. A magistrate held hearings on the motion in March and May of 2012. MCCS presented the

testimony of Sherree Spence, ongoing caseworker for MCCS, and Dr. Julia King, the psychologist who assessed the parents in 2010. Their testimony established the following facts.

{¶ 5} At the time of S.J.'s removal in 2009, a case plan was developed for S.J.'s parents. MCCS carefully reviewed the case plan with the parents at that time, and both parents agreed to the case plan. Father's objectives under the plan were to complete a parenting/psychological assessment and follow through with recommendations, complete a visitation assessment, complete a parenting class, complete his GED and improve his reading, obtain stable income and housing, and improve his hygiene such that it would not pose a health risk to his child. Unlike Mother's case plan, Father's case plan did not include a mental health component.

{¶ 6} Dr. King evaluated both parents in February and March of 2010. The parents were seen separately, together, and with S.J. Father had an eighth grade education and received special education classes as a child. When Father was growing up, there had been concerns about the condition of his home environment. Father reported having a seizure disorder, but had not had a seizure within six months of his assessment by Dr. King. Father has another son, who is older than S.J., with another woman. Father's involvement with the older child was initially consistent, but in the last several years, he has visited only once per month; the older child's mother reported that hygiene has been an issue with Father.

{¶ 7} During his evaluation with Dr. King, Father gave appropriate responses about disciplining. Father did not think there was a basis for S.J. to be removed and,

instead, thought that S.J. should have come home from the hospital with his parents. Dr. King concluded that Father lacked insight regarding the parents' circumstances. Dr. King's testing revealed a large discrepancy between Father's verbal score, which was extremely low, and his nonverbal score, which was average. Dr. King indicated her concern that Father's poor verbal skills would hinder his ability to benefit from many intervention services. Father did not have any mental health issues. Dr. King did not observe anything problematic during the parents' interaction with S.J. in March 2010, however she expressed concern about Father's ability to parent independently. Dr. King stated that she had not done any assessments of Father since March 2010. She acknowledged that she "can't say what's needed now."

{¶ 8}     At the time of the hearing, Father and his wife, S.J.'s mother, resided with Father's mother and grandmother in a two-story single family home that had formerly been a duplex, the same home in which the parents lived when S.J. was born. Until March 2012, MCCS was denied access to the home. When access was granted prior to the March 2012 hearing, Spence observed roaches crawling on the floor, an entertainment center, curtains, cat food bowls, and cat litter containers; Father told Spence that he knew there were roaches and he was trying to work on resolving that issue. There were eight dogs and nine cats living in the house.[1] Several areas of the house needed repair; S.J.'s prospective bedroom had missing plaster in a closet and a hole in the door where a door handle would be. Several rooms were locked during the home visit, and Spence was denied access to them. Other areas had plywood blocking access; some plywood had nails sticking out of it.

---

[1] The guardian ad litem's report indicated that "approximately 7 dogs and 5 cats" lived in the house.

Spence observed exposed electrical cords and outlets. An area on the floor in the corner of the living room or dining room had newspaper for dogs to use to defecate and urinate; there was nothing to keep S.J. away from that area. The grandmother's room was extremely cluttered, and several areas "were just simply unclean." The house had a strong odor of animal urine. The house did contain food. Spence testified that Father's home was "not appropriate" and was "unacceptable" for S.J.

{¶ 9} Spence testified that S.J.'s parents had lived with S.J.'s maternal grandmother in December of 2009. From June to August of 2010, they had their own apartment, but they were evicted for nonpayment. The parents have been residing with S.J.'s paternal grandmother since August 2010.

{¶ 10} Spence testified that Father did not have sufficient income to support S.J. Father was referred to the Job Center and to the Bureau of Vocational Rehabilitation, but has not gone to BVR. Both parents stated that they did not want potential employers to know that they have "delays." Father reported to Spence that he donates plasma and works at a barn cleaning horse stalls. However, Spence testified that Father had not provided verification of income and had not indicated how much he receives as income. The March 2012 guardian ad litem report indicated that Father stated that he earned $250 per month by donating plasma and $250 per month from scrapping. Father applied for Social Security, but was denied; Father was appealing that decision. Father told Spence that he compensates his mother for some of the rent she pays.

{¶ 11} Father has not obtained his GED. Father was referred to Miami Valley Literacy Council, but he did not follow through with that referral. Father told Spence that

he did not have time. Spence testified that, for a period, Father had employment so the GED requirement was put "on the back burner." However, Spence indicated that Father was not currently employed.

{¶ 12} Hygiene continued to be an issue with both parents. They were repeatedly told not to arrive at visits in a manner where their hygiene would pose a risk to S.J. S.J. was getting tear duct infections after his visits with his parents. Spence told the parents that they needed to shower, wear clean clothes, and clean their nails before visiting. Spence testified that she continues to have periodic conversations about hygiene, and that some days are better than others. Spence expressed that hygiene was still a concern.

{¶ 13} Spence also expressed concern about Father's visitation with S.J. Until March 2010, visitation had been scheduled for two days per week. Due to multiple missed visits, visitation was reduced to one day per week from 4:30 - 7:00 p.m., and the parents were required to arrive by 3:30 p.m. S.J.'s parents visited consistently between January and March of 2011. From April to September 2011, they missed half of their visits. From September 2011 to December 2011, S.J.'s mother missed visitation, purportedly due to a contagious illness, and Father came only once on his own in October 2011. During that visit, Father had to be awakened twice; the visit was ended early because Father was sleeping while alone with the child. When asked why he did not visit more from September to December, Father stated that he did not have transportation. Since January 2012, both parents have visited about 75% of the time.

{¶ 14} Spence testified that Father's sleeping during visits has happened more than once. Mother reported that Father sleeps because he works for a few hours in the morning

and has a seizure disorder; Father has not provided a reason for falling asleep. Spence stated that the parents have left visitation early on three occasions since December, and there had previously been concerns about their leaving early.

{¶ 15} Father completed the visitation assessment and the psychological and parenting assessment objectives.

{¶ 16}    At the time of the hearings, S.J. was approximately two and a half years old and had medical issues that required ongoing care. S.J. was receiving feeding therapy with Help Me Grow to address an issue he had with swallowing certain textures of food, and speech and occupational therapy with PACE. S.J. was being observed for dyspraxia, a developmental delay, and had recently been recommended to obtain therapy for separation anxiety related to his foster mother and a foster sibling. S.J. twice had tubes placed in his ears and his adenoids were removed. S.J. has asthma and was receiving allergy medicine and breathing treatment.

{¶ 17} S.J. has been with the same foster family since his birth. He was strongly bonded to his foster family, particularly his foster mother, and was integrated into the family. S.J.'s needs were being met by the foster parents. Spence testified that S.J. is adoptable, and that his foster parents are a potential placement.

{¶ 18} MCCS has looked at four other individuals as potential placements. A home study was conducted on a maternal aunt in Georgia. The home study was denied due to the aunt's income and the home conditions. At one point, S.J.'s maternal grandmother expressed interest in S.J., but she did not come to MCCS for fingerprinting and to begin the home study. The maternal grandmother has since expressed that she was not going to

follow through with MCCS. A couple who were friends of the family were also contacted as a possible placement, but they indicated that they were moving and then never contacted the agency to have a home study done. Finally, S.J.'s paternal grandmother, with whom Father and Mother live, was offered as a potential placement. Spence stated that her home study would not be approved because S.J.'s parents reside there and the house is unsafe. In addition, the grandmother has multiple mental health issues, including schizophrenia, and MCCS has not received documentation from her doctor that she has been compliant and successful with treatment and that she would be capable of handling a small child.

{¶ 19} The guardian ad litem recommended, both in a written report and at the conclusion of the May 2012 hearing, that permanent custody be granted to MCCS.

{¶ 20} Following the hearings, the magistrate issued a decision granting permanent custody of S.J. to MCCS. The magistrate found that S.J. had been in the temporary custody of MCCS for 12 or more months of a consecutive 22-month period under R.C. 2141.414(B)(1)(d), and that permanent custody to MCCS was in S.J.'s best interest under both R.C. 2151.414(D)(1) and (D)(2).

{¶ 21} Father filed objections to the magistrate's decision. The trial court overruled Father's objections, finding that R.C. 2151.414(B)(1)(d) was satisfied and that permanent custody was in the child's best interest under R.C. 2151.414(D)(1). The trial court did not address whether the elements of R.C. 2151.414(D)(2) were also met.

{¶ 22} Father appeals from the trial court's judgment.[2]

---

[2] S.J.'s mother filed a separate appeal from the trial court's judgment. On July 3, 2013, we affirmed the trial court's judgment as to Mother. *In re S.J., Jr.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935.

## II. Analysis

{¶ 23} Father raises three assignments of error, which read:

I. THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO THE MONTGOMERY COUNTY CHILDREN SERVICES BECAUSE THE AGENCY FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT PERMANENT CUSTODY WAS IN THE BEST INTEREST OF THE CHILD.

II. THE TRIAL COURT ERRED IN FINDING THAT MONTGOMERY COUNTY CHILDREN SERVICES HAD MADE EVERY REASONABLE EFFORT TO PREVENT THE REMOVAL OF THE CHILD FROM [HIS] BIOLOGICAL PARENTS AND/OR FAMILY MEMBERS.

III. THE TRIAL COURT ERRED IN BASING ITS OPINION ON MEDICAL EXPERT TESTIMONY FROM TWO YEARS PRIOR WITH NO UPDATED INFORMATION AVAILABLE.

{¶ 24} Father claims that the trial court erred in granting permanent custody of S.J. to MCCS, because the agency did not establish that permanent custody was in S.J.'s best interest, the agency did not make every reasonable effort to prevent S.J.'s removal from his family, and the trial court improperly relied on Dr. King's testimony, which was based on an outdated evaluation.

{¶ 25} R.C. 2151.414 establishes a two-part test for courts to apply when determining a motion for permanent custody to a public services agency. The statute requires the court to find, by clear and convincing evidence, that: (1) granting permanent custody of the child to the agency is in the best interest of the child; and (2) either the child

(a) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) are present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for twelve or more months of a consecutive twenty-two month period. R.C. 2151.414(B)(1); *In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 14, citing *In re K.M.*, 8th Dist. Cuyahoga No. 98545, 2012-Ohio-6010, ¶ 8.

{¶ 26}    R.C. 2151.414(D) directs the trial court to consider all relevant factors when determining the best interest of the child, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable. R.C. 2151.414(D); *In re S.J.* at ¶ 15.

{¶ 27}    A trial court's decision on termination "will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citations omitted.) *In*

*re A.U.*, 2d Dist. Montgomery No. 22264, 2008-Ohio-186, ¶ 15. Furthermore, "issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact." *In re A.J.S.*, 2d Dist. Miami No. 2007 CA 2, 2007-Ohio-3433, ¶ 22. The "rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984); *In re J .Y.*, 2d Dist. Miami No. 07-CA-35, 2008-Ohio-3485, ¶ 33.

**{¶ 28}** In this case, S.J. has resided with the same foster family since he was born and released from the hospital. Father does not dispute that S.J. has been in the temporary custody of MCCS for 12 or more months of a consecutive 22-month period, as set forth in R.C. 2141.414(B)(1)(d).

**{¶ 29}** S.J. is bonded with his foster family, particularly his foster mother and foster siblings. The foster parents are meeting S.J.'s needs, including those associated with his disabilities. S.J. has no relationship with his biological half-siblings. Although S.J. is too young to express an opinion, his guardian ad litem has stated that permanent custody to MCCS was in S.J.'s best interest. S.J. has been in the temporary custody of MCCS for more than twelve months, and the evidence demonstrated that there were no other secure placements for S.J., although four potential placements were considered.

**{¶ 30}** Father has failed to complete many aspects of his case plan. Father resided with his wife, mother and grandmother in the grandmother's home. The evidence at trial revealed that the home was unclean, needed repair, had an area inside where dogs were

allowed to urinate and defecate, and had problems with cockroaches. The house was deemed unsafe for S.J. Although there had been improvement with Father's hygiene, hygiene continued to be an ongoing concern. Father has not obtained a GED and does not have a steady source of income. Father's visitation with S.J. was originally twice per week, but was reduced to once per week due to missed visitations. Father has missed many of the scheduled weekly visits with S.J., and there have been issues with Father's sleeping during visitation and leaving early when he does attend.

{¶ 31} Based on our review of the record, there is competent, credible evidence to support the trial court's conclusion, by clear and convincing evidence, that granting permanent custody to MCCS was in S.J.'s best interest. Father's first assignment of error is overruled.

{¶ 32} In his second assignment of error, Father argues that MCCS did not make "every reasonable and diligent effort to assist the parents to remedy the problems [that] initially caused the child to be placed outside the home," as required by R.C. 2151.414(E)(1). R.C. 2151.414(E) states, in part:

In determining at a hearing held pursuant to division (A) of this section or for

the purposes of division (A)(4) of section 2151.353 of the Revised Code

whether a child cannot be placed with either parent within a reasonable period

of time or should not be placed with the parents, the court shall consider all

relevant evidence. If the court determines, by clear and convincing evidence,

at a hearing held pursuant to division (A) of this section or for the purposes of

division (A)(4) of section 2151.353 of the Revised Code that one or more of

the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

{¶ 33} In overruling Father's objections and granting permanent custody to MCCS, the trial court expressly found that R.C. 2151.414(B)(1)(d) was met and that permanent custody to MCCS was in S.J.'s best interest under R.C. 2151.414(D)(1). In relying on R.C. 2151.414(B)(1)(d) and R.C. 2151.414(D)(1), the trial court did not need to consider – and it did not address – whether MCCS engaged in reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home. As stated above, there was competent, credible evidence to support the trial court's conclusions that R.C. 2151.414(B)(1)(d) was

satisfied and that permanent custody was in S.J.'s best interest under R.C. 2151.414(D)(1).

{¶ 34} Regardless, there was competent, credible evidence to support the magistrate's conclusion that S.J. could not and should not be placed with Father "within a reasonable time because notwithstanding reasonable case planning and diligent efforts by the agency, the mother and father have failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside of the home." MCCS prepared a case plan for Father after S.J.'s removal. The case plan included several objections, including that Father obtain a parenting and psychological assessment, improve hygiene, obtain stable income and housing, and complete his GED. There was evidence at the permanent custody hearing that MCCS provided referrals to assist with these objectives. Although Father completed various assessments and improved his hygiene, several of Father's objectives were not completed. After more than two years from S.J.'s removal, Father had not yet obtained appropriate housing, did not have stable income, and did not maintain consistent contact with S.J. through visitation. Father's second assignment of error is overruled.

{¶ 35} Father also claims that the trial court erred in relying on Dr. King's testimony regarding her 2010 evaluation of Father when no updated evaluation was conducted. The trial court did not cite to Dr. King's testimony in overruling Father's objections and granting permanent custody to MCCS. Nevertheless, to the extent that the trial court relied on Dr. King's testimony, this was a weight decision by the trier of fact. Father's third assignment of error is overruled.

### III. Conclusion

**{¶ 36}** The trial court's judgment will be affirmed.

. . . . . . . . . .

FAIN, P.J. and WELBAUM, J., concur.

Copies mailed to:

Matthew T. Crawford
Sarah Michel
Hon. Nick Kuntz