**In re S.C. et al.**

[Cite as *In re S.C.*, 189 Ohio App.3d 308, 2010-Ohio-3394.]

Court of Appeals of Ohio,
Fourth District, Pike County.

Nos. 09CA798 and 09CA799.

Decided July 12, 2010.

Pamela C. Childers, for appellant John Collins.

Dana E. Gilliland, for appellant Mary Nichols.

Charles Robert Junk Jr., Pike County Prosecuting Attorney, and Anthony A. Moraleja, Assistant Prosecuting Attorney, for appellee.

McFARLAND, Presiding Judge.

{¶ 1} Appellants John Collins and Mary Nichols appeal the decision of the Pike County Court of Common Pleas terminating their parental rights and awarding permanent custody of their children to the Pike County Children Services Board. Regarding Collins's appeal, because we cannot say that there is clear and convincing evidence that such an action was in the best interests of the children, we must reverse the trial court's decision to terminate his parental rights. However, as to Nichols's appeal, we find that she failed to oppose the motion for permanent custody in the proceedings below. And even if in so doing she did not waive her right to appeal, none of her assignments of error are warranted. Accordingly, we affirm the trial court's decision as to Nichols, overrule its decision as to Collins, and remand the matter for further proceedings consistent with this opinion.

## I. Facts

{¶ 2} This case involves the permanent custody of three minor children, S.C., M.C., and D.C. In July 2009, the time of the final permanent-custody hearing,

S.C. was nine years old, M.C. was seven, and D.C. was three. The children's parents are the appellants in this case, John Collins and Mary Nichols. Though never married, Collins and Nichols have been involved in a relationship for many years. They are also the parents of an older child, approximately 14 years old at the time of the permanent-custody hearing. This older child is not directly involved in the case at hand.

{¶ 3} Pike County Children Services first obtained temporary custody of S.C. and M.C. in December 2004; D.C. was not yet born. Temporary custody was obtained due to allegations of neglect, concerns with Collins's alcohol abuse, poor home conditions, and lack of parental supervision. All parties stipulated to a finding of dependency. A case plan was implemented, with which both Collins and Nichols successfully complied, and they regained custody of S.C. and M.C. in September 2005. In late 2006, the couple split and began living in separate residences.

{¶ 4} In May 2007, S.C., M.C., and D.C., living with Nichols, were removed from her home due to her mental illness. At the time, Nichols was hallucinating and displaying delusional behavior. In August 2007, Children Services filed dependency complaints and again sought temporary custody of the children. Collins requested placement of the children in his home. Collins and Nichols later both stipulated to a finding of dependency, and the trial court again awarded temporary custody to Children Services. Children Services implemented a case plan with Collins and Nichols, with the goal of reunification. Under the terms of the case plan, due to his history of alcohol abuse, Collins was to continue therapy and follow all recommendations of his therapist and treatment team. Children Services also requested that he undergo a psychological evaluation, which he agreed to. At some point after temporary custody was awarded to Children Services, Collins and Nichols began residing together again.

{¶ 5} In October 2008, Children Services filed a motion for permanent custody of S.C., M.C., and D.C. The motion was subsequently withdrawn and then refiled in March 2009. The final permanent-custody hearings took place in May and July 2009. At the hearing, Children Services presented the testimony of caseworkers, the foster parents, the children's guardian ad litem, and the psychologists who had given Collins and Nichols psychological evaluations back in 2007. At the close of the hearing, the trial court requested briefs from the parties and took the matter under advisement. The trial court subsequently entered a judgment granting permanent custody of the children to Children Services.

{¶ 6} Collins and Nichols separately appealed the trial court's decision. We sua sponte consolidated the appeals and consider them together in this opinion.

## II. John Collins's Assignments of Error

First Assignment of Error

The due process rights of the children were violated by the failure of the trial court to properly notify the children, through their guardian ad litem, to apply for legal counsel on the permanent custody motion.

Second Assignment of Error

The trial court erred by failing to appoint an attorney in addition to a non-attorney guardian ad litem to represent the interests of the children in violation of their due process rights.

Third Assignment of Error

The trial court erred by permitting a non-attorney guardian ad litem to act as trial counsel for the children during the initial trial on permanent custody; and by not insuring guardian ad litem compliance with Supreme Court Rule of Superintendence 48, as amended.

Fourth Assignment of Error

The trial court erred by admiting [sic] and relying upon the guardian ad litem reports that contained underlying hearsay information, and that were submitted outside of the requirements of Supreme Court Superintendence Rule 48.

Fifth Assignment of Error

The trial court denied Collins' right to effective assistance of counsel by failing to grant Collins' motion for independent psychological evaluation, or at least requiring the agency to update the evaluation.

Sixth Assignment of Error

The evidence does not support the trial court's finding the agency made reasonable efforts.

Seventh Assignment of Error

The trial court's ruling is not supported by clear and convincing evidence.

## III. Mary Nichols's Assignments of Error

First Assignment of Error

The trial court erred in failing to appoint an attorney in addition to a non-attorney guardian ad litem to represent the interests of the children in violation of their due process rights.

Second Assignment of Error

The trial court erred to the prejudice of Mary Nichols by permitting a non-attorney guardian ad litem standing as a trial counsel for the children during the initial trial on permanent custody; and specifically the guardian ad litem violated various provisions of Ohio Supreme Court Rule of Superintendence 48 as amended.

Third Assignment of Error

The trial court erred to the prejudice of appellant by admiting [sic] and relying upon the guardian ad litem reports that contained underlying hearsay information, and further that were submitted following the conclusion of the permanent custody proceedings and outside of the requirements of Supreme Court Superintendence Rule 48 as amended.

Fourth Assignment of Error

The due process rights of the children were violated by the failure of the trial court to properly notify the children, through their guardian ad litem of the right of the children to apply for legal counsel on the permanent custody motion.

Fifth Assignment of Error

Appellant, Mary Nichols was denied her constitutional due process rights at all stages of the proceedings before the trial court.

Sixth Assignment of Error

Appellant, Mary Nichols was denied effective assistance of counsel during the permanent custody proceedings.

## IV. Standard of Review

{¶ 7} An appellate court will not overrule a trial court's decision regarding permanent custody if there is competent and credible evidence to support the judgment. *In re McCain*, 4th Dist. No. 06CA654, 2007-Ohio-1429, 2007 WL 914870, at ¶ 8. "If the trial court's judgment is supported by some competent, credible evidence going to all the essential elements of the case, an appellate court must affirm the judgment and not substitute its judgment for that of the trial court." *In re Buck*, 4th Dist. No. 06CA3123, 2007-Ohio-1491, 2007 WL 942097, at ¶ 7. Therefore, an appellate court's review of a decision to award permanent custody is deferential. *McCain* at ¶ 8.

{¶ 8} "An agency seeking permanent custody bears the burden of proving its case by clear and convincing evidence." *In re Perry*, 4th Dist. Nos. 06CA648 and 06CA649, 2006-Ohio-6128, 2006 WL 3353974, at ¶ 39. "Clear and convincing evidence" has been defined as "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *McCain* at ¶ 9, citing *In re Estate of Haynes* (1986), 25 Ohio St.3d 101, 103–104, 25 OBR 150, 495 N.E.2d 23.

## V. Analysis of John Collins's Assignments of Error

{¶ 9} In his seventh assignment of error, Collins argues that the trial court's decision is not supported by clear and convincing evidence. Because we find that this assignment of error is dispositive, we address it out of order.

{¶ 10} Under R.C. 2151.414(B)(1), an agency seeking permanent custody must meet a two-part test before terminating parental rights and awarding permanent custody. *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, at ¶ 31. First, one or more of the conditions listed in R.C. 2151.414(B)(1)(a) through (d) must apply:

{¶ 11} "(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

{¶ 12} "(b) The child is abandoned.

{¶ 13} "(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

{¶ 14} "(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *."

{¶ 15} An agency seeking permanent custody must also demonstrate by clear and convincing evidence that such an action is in the best interest of the child. R.C. 2151.414(D) sets forth the factors a court must consider in the best-interest analysis:

{¶ 16} "(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

{¶ 17} "(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

{¶ 18} "(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

{¶ 19} "(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

{¶ 20} "(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."

{¶ 21} Divisions (E)(7) to (11) include (7) whether the parent has been convicted of a number of listed offenses, (8) whether the parent has repeatedly withheld medical treatment or food, (9) whether the parent has placed the child at substantial risk of harm two or more times due to substance abuse and has rejected treatment two or more times or refused to participate in treatment, (10) whether the parent has abandoned the child, (11) whether the parent has had parental rights previously terminated.

{¶ 22} Thus, to terminate parental rights and award permanent custody, a trial court must find that both parts of the two-part test under R.C. 2151.414 have been established. In the case sub judice, it is undisputed that one part of the test has been met. When the motion for permanent custody was filed, S.C., M.C., and D.C. had been in foster care, in the temporary custody of Children Services, for more than 12 months of a consecutive 22–month period. Therefore, one of the conditions listed under R.C. 2151.414(B)(1) applies, specifically subsection (d). Accordingly, our analysis shifts to the other prong of the permanent-custody test, whether or not permanent custody is in the best interests of the children.

{¶ 23} Testimony concerning the best-interest factors shows that the children have strong bonds with both Collins and their foster family, the Tacketts. S.C. and D.C. were placed with the Tacketts previously in 2005, when they were first placed in temporary custody. And it is uncontested that the Tacketts have provided excellent care of the children and that they seek to adopt them. The children have expressed various wishes concerning their placement: S.C. stating that she would like to remain with her foster family, though she doesn't want to

hurt the feelings of her biological parents; M.C. vacillating between his wishes, but most recently stating that he wanted to live with Collins; and D.C. being too young to state an opinion.

{¶ 24} During its best-interest analysis, the trial court made a number of findings in determining whether legally secure placement could be made without awarding Children Services permanent custody. In ultimately deciding that Collins was unsuited to assume his parental rights, the court stated the following:

{¶ 25} "Even though the father has basically satisfied the little that was required of him as far as the requirements of the case plan, his past history and mental ability are very relevant. The father was unable to overcome these factors in his past to satisfy the 'best interest' test.

{¶ 26} "The constant involvement with agencies since 1999 over child neglect and alcohol usage appear to offset any changes he has made regarding his drinking. For him to parent four children would seem to be beyond his ability. He is on SSI for depression and breathing problems. He does not have a good support system in place such as friends or relatives to assist him. Further evidence of this testing indicated that he was functioning on the borderline level with regards to his own cognitive abilities."

{¶ 27} The court also stated that for the past several years, the family had "lived in chaos," and that Collins's alcohol abuse was a primary factor in that chaos.

{¶ 28} In arriving at the above findings, the trial court relied to a large extent upon the psychological evaluation that Collins was given on August 27 and September 4, 2007, and the testimony of the psychologists who administered and supervised that testing. But considering the large role Collins's psychological evaluation played in the trial court's decision, the fact that it was almost two years out of date raises very serious issues.

{¶ 29} The trial court, itself, recognized this problem. Though its best-interest analysis led it to determine that Collins's parental rights should be terminated and permanent custody awarded to Children Services, the court stated, "However, the Court is not pleased with the fact that [Children Services] did not update the psychological report and use it in their case plan. Even though the outcome was in their favor, the facts in other cases may not bring a similar result." The court also stated that Dr. Hedges, the psychologist overseeing Collins's evaluation, testified that the outdated evaluation was "not totally reliable as intervening factors may be relevant." But Dr. Hedge's testimony concerning the psychological evaluation was even more cautionary than that.

{¶ 30} During the hearing, when questioned by the trial court as to the continuing validity of Collins's psychological evaluation, Dr. Hedges specifically

stated the following: "[I]t's inappropriate to use a psychological evaluation that's almost two years old as a basis of any significant decision." Collins was last evaluated in September 2007. By the time of the final custody hearing in July 2009, some of the relevant circumstances surrounding his situation had changed considerably. At the time of the evaluation, Collins had been sober for only a few months. Therefore, his alcohol abuse was deemed to have been in only "partial remission." At the time of the final custody hearing, the evidence was that Collins had been sober for two and half years. Dr. Amanda Martin, the psychologist who actually administered the evaluation, testified that even one year of sobriety was clinically significant and that Collins would now be classified as being in "full remission." Though Dr. Hedges testified that elements of the report would remain the same, for example, Collins's borderline intellectual functioning and personality dynamics, he acknowledged that he could not tell with "psychological certainty" to what extent Collins's parental deficits could be attributed to his previous alcohol abuse.

{¶ 31} There have been other changes, as well, since the time of Collins's evaluation. It is uncontested that Collins successfully complied with his case plan by continuing to seek treatment for his depression and alcoholism. Though not required to do so under the case plan, Collins also successfully completed a parenting class. Further, in an attempt to provide better housing for his children, Collins has twice moved into larger homes. And though clutter and cleanliness have been recurring issues, the children's guardian ad litem testified that since May 2008, Collins has maintained an adequate residence. Additionally, recognizing that Nichols's presence could be detrimental to his attempt to regain custody, Collins stated that if that was the case, he would remove her from his home.

{¶ 32} In light of all the above, we cannot say that Children Services has proved by clear and convincing evidence that a secure placement for the children can be achieved only by terminating Collins's parental rights. There is no doubt that whether or not Children Services should be awarded permanent custody is extremely close in this case. The family's caseworker and the children's guardian ad litem both recommend that permanent custody be awarded to Children Services. Both hold the opinion that Collins will be unable to adequately care for the children without at least some minimal agency support, and that support is currently unavailable. On the other hand, Collins still has custody of his oldest child, who was approximately 14 at the time of the final hearing, and Children Services has stated that it does not seek to remove that child from Collins's home.

{¶ 33} Our decision should certainly not be construed as determining that Collins should regain custody of S.C., M.C., and D.C., nor does it mandate that Children Services should not, in the future, seek permanent custody. It may well

be that despite his best intentions and compliance with his case plan, Collins is unable to adequately parent his children without outside supervision—supervision that is currently unavailable. Rather, our decision is that such a determination should not be made primarily on the basis of a two-year-old psychological evaluation when conditions regarding both Collins's sobriety and his home environment have demonstrably changed.

{¶ 34} The Supreme Court of Ohio has described the termination of parental rights as the family-law equivalent of the death penalty. *In re Smith* (1991), 77 Ohio App.3d 1, 16, 601 N.E.2d 45. "The parties to such an action must be afforded every procedural and substantive protection the law allows." Id. In the case sub judice, Children Services' own expert witness testified that it would be inappropriate to use a two-year-old psychological evaluation as the basis of any significant decision. But by relying to a large degree upon Collins's evaluation in terminating his parental rights, that is exactly what was done. Accordingly, we must reverse the trial court's decision to terminate Collins's parental rights.

### VI. Analysis of Mary Nichols's Assignments of Error

{¶ 35} Nichols presents six assignments of error. We first note that some of her arguments are based on issues that arose before the permanent-custody hearing—namely, the adjudication of the children as dependent and the following temporary-custody disposition. To the extent that her assignments of error are predicated upon such events, they are overruled. The proper time to appeal any issue arising during the dependency-adjudication and temporary-custody disposition was immediately after the trial court's entry on those matters. Issues that arose during those proceedings will not be reviewed here. See, e.g., *In re B.D.*, 4th Dist. No. 08CA3016, 2008-Ohio-6273, 2008 WL 5077641, at ¶ 22; *In re K.G.*, 7th Dist. No. 09 MA 56, 2009-Ohio-6531, 2009 WL 4755493, at ¶ 28.

{¶ 36} In addition, some issues Nichols raises are based upon the original permanent-custody motion filed in October 2008. That motion was subsequently withdrawn, and Children Services refiled it in March 2009. Because the trial court's permanent-custody decision was based upon the March 2009 motion and the subsequent hearings, Nichols's arguments concerning issues that may have arisen during the original permanent-custody proceedings are, likewise, not pertinent in the current appeal.

### A. First Five Assignments of Error

{¶ 37} As to the permanent-custody hearing itself, the trial court found that Nichols did not contest the termination of her parental rights. Consistent with that finding, though she was a party to the proceedings below and was represented by counsel, she took no active part in the permanent-custody hearing, neither

presenting witnesses, questioning witnesses, nor testifying herself. In its finding of fact and conclusions of law, the trial court stated, "The mother is not seeking custody because of her mental condition, but wishes the children to be returned to the father with whom she moved in with in the winter of 2008." The court further stated, "The Court finds that the mother does not seek custody and further suffers from an ongoing mental disease that would prevent her from assuming custody."

{¶ 38} The conclusion that Nichols did not contest the termination of her parental rights in the proceedings below has other support in the record. Even before Children Services moved for permanent custody, Nichols indicated that she wanted to relinquish custody of her children. The trial court's findings of fact in a prior motion to extend permanent custody stated, "Mary has expressed her desire to terminate her parental rights as she feels that she is unable to care for the children at this time."

{¶ 39} During the permanent-custody proceedings, Nichols's participation consisted only of trying to buttress Collins's custody claims against Children Services; she did not seek to assert her parental rights on her own behalf. Her own memoranda acknowledges that she "did attempt to work her case plan, however, due to her limited capacity because of mental health issues placement back with mother is not a reality."

{¶ 40} Even if she did not waive her right to appeal by failing to contest the termination of her parental rights in the proceedings below, her appeal fails on its merits. Nichols's first five assignments of error raise issues that she did not object to at the time of trial. Accordingly, for these assignments of error, she has waived all but plain error. It is well settled that a party must object to an adverse ruling in order to preserve the issue for appeal. See, e.g., *State v. Jones* (2001), 91 Ohio St.3d 335, 343, 744 N.E.2d 1163; *State v. Robb* (2000), 88 Ohio St.3d 59, 75, 723 N.E.2d 1019; *State v. Lindsey* (2000), 87 Ohio St.3d 479, 482, 721 N.E.2d 995.

{¶ 41} Plain error is reversible error to which no objection was lodged at trial; it is obvious and prejudicial, and if permitted, it would have a material adverse effect on the character and public confidence in judicial proceedings. *State v. Craft* (1977), 52 Ohio App.2d 1, 7, 6 O.O.3d 1, 367 N.E.2d 1221. See also Crim.R. 52(B). Notice of plain error is to be taken with utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus. An alleged error "does not constitute a plain error * * * unless, but for the error, the outcome of the trial clearly would have been otherwise." Id. at paragraph two of the syllabus.

{¶ 42} The trial court's decision in the case sub judice does not constitute a manifest miscarriage of justice that would require us to recognize plain error. Accordingly, her first five assignments of error are overruled. In any event, as will be more fully detailed in our analysis of Nichols's sixth assignment of error, she is unable to show that, but for the alleged errors, the trial court's decision would have been otherwise.

### B. Sixth Assignment of Error

{¶ 43} Nichols's sixth assignment of error contends that she was denied effective assistance of counsel. In order to establish ineffective assistance of counsel, an appellant must show that counsel's representation was both deficient and prejudicial. *In re Sturm*, 4th Dist. No. 05CA35, 2006-Ohio-7101, 2006 WL 3861074, at ¶ 77; *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. "Deficient representation" means counsel's performance was below an objective standard of reasonableness. Id. To show prejudice, an appellant must show that it is reasonably probable that, except for the errors of his counsel, the proceeding's outcome would have been different. Id.

{¶ 44} In the case at bar, Nichols's claim of ineffective assistance fails because her counsel's representation was not prejudicial. The record below shows that Nichols is unable to provide adequate care for her children and there is absolutely no indication that she will ever be able to do so in the future. Therefore, she is unable to show that, but for counsel's alleged errors, the trial court would not have terminated her parental rights.

{¶ 45} At the permanent-custody hearing, there was testimony that Nichols suffers from schizophrenia and that her symptoms include hallucinations, delusions, psychotic symptoms, and difficulty responding emotionally. Her delusional behavior is what led Children Services to seek temporary custody of S.C., M.C., and D.C. in May 2007. She continues to take medication for her mental illness and attends "partial hospitalization" three days a week, in an intensive outpatient program. There she attempts to learn socialization and daily-living skills. There was testimony that she continues to need that program.

{¶ 46} The court also heard testimony that before she met Collins, Nichols had already lost custody of five other children she had given birth to. And S.C., M.C., and D.C. had been removed from her custody multiple times before the current proceedings. Recognizing that her presence alone could prevent Collins from regaining custody, Nichols indicated that she would make other living arrangements if it facilitated his custody claim.

{¶ 47} As limited as Collins's parenting skills and abilities to care for his children may be, the record plainly shows that Nichols's capabilities are more

deficient. In addition to her serious mental-health issues and borderline cognitive functioning, the trial court heard testimony from a caseworker that Collins relates better to S.C., M.C., and D.C. than does Nichols. "Um, the children respond much more to Johnny overall, I believe, than what they do Mary. Sometimes when Mary will be at visits, she is um, I think her medications and things she doesn't respond all the time and it's kind of a hit or miss type thing with Mary." Most telling of all, Nichols's own permanent-custody memorandum states that "due to her limited capacity because of mental health issues placement back with mother is not a reality."

{¶ 48} The possibility that Collins will ever be able to provide the care his children need and regain custody is marginal, at best. But that possibility demands that we not affirm the trial court's decision to terminate his parental rights at this time. Nichols, however, does not fall into the same category. Her history, her cognitive deficits and mental-health issues, and the entire record below show that she simply cannot care for S.C., M.C., and D.C., and they should never be returned to her custody.

{¶ 49} In light of the facts and circumstances related above, Nichols cannot show that but for the alleged ineffective assistance of her trial counsel, the trial court's decision would have been otherwise. Accordingly, her sixth assignment of error also fails.

## VII. Conclusion

{¶ 50} For the foregoing reasons, we find merit in Collins's seventh assignment of error. After a thorough review of the record below, we are unable to say that there is clear and convincing evidence that awarding permanent custody of S.C., M.C., and D.C. to Children Services and terminating Collins's parental rights is in the children's best interests. Accordingly, we reverse the trial court's decision and remand the case for further proceedings consistent with this opinion. Because Collins's seventh assignment of error is dispositive, his remaining assignments of error in this opinion are rendered moot. As to Nichols's appeal, we find that she failed to contest the termination of her parental rights. Further, even if she did not waive her right to appeal by doing so, we overrule each of her six assignments of error on their merits.

Judgment affirmed in part
and reversed in part,
and cause remanded.

HARSHA and ABELE, JJ., concur.